UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| DEBRA A. MORIN, | ) | |
| | ) | |
| Plaintiff, | ) | 2:16-CV-00050-MCLC |
| | ) | |
| vs. | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the United States Magistrate Judge, with the consent of the parties and an order of reference under 28 U.S.C. § 636 [Doc. 13], for decision and entry of judgment. Plaintiff's application for disability insurance benefits was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. Plaintiff has filed a Motion for Summary Judgment [Doc. 14], while the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 18].

**I.      Standard of Review**

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not

try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff's earnings records show that she has acquired sufficient quarters of coverage to remain insured through September 30, 2015. Thus, she must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. At all applicable times, Plaintiff was "closely approaching retirement age" with a high school education. She has past relevant work as a bookkeeper, caretaker, and assisted-living manager.

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's RFC, can he or she perform his or her past relevant work?

5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC

— do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997). However, "[t]he burden shifts to the Commissioner at [the] fifth step to establish the claimant's ability to do other work." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted). The ALJ in this case found Plaintiff had no medically determinable impairments. (Tr. 14-17). Accordingly, the ALJ found that she was not disabled at step two of the sequential evaluation process. Notably, Plaintiff is only challenging the ALJ's findings related to her alleged mental impairments.

## II. Evidence in the Record

Plaintiff's medical evidence is accurately summarized in the Commissioner's brief as follows:

> In July 2011, Plaintiff went to urgent care with complaints of epigastric pain, shaking, nausea, and a decrease in appetite (Tr. 281). She stated that her symptoms increased when she was anxious (Tr. 281). Four days later, Plaintiff followed up with Angela Lambert, M.D. (Tr. 28587). She reported experiencing moderate anxiety for the past six months and endorsed symptoms of difficulty concentrating, fatigue, feelings of worthlessness, helpless feeling, suicidal ideation, weight loss, insomnia, and loss of appetite (Tr. 285). She also reported a 50 pound weight loss, job loss, financial difficulties, and a prior plan to commit suicide by overdosing on medication (Tr. 285). She had never been diagnosed with anxiety, but had "always been a nervous person even as a child" (Tr. 285). She remembered "throwing up before the first day of school and before getting married, etc." (Tr. 285). She stated she had quit her job in January because the long hours and night work had exacerbated her anxiety (Tr. 283, 285). Upon examination, Plaintiff appeared "anxious and tremulous at times, and teary" (Tr. 286). She had intact judgment and insight, logical thought content, normal rate of thoughts, normal and appropriate mood and affect, normal associations, and no hallucinations, delusions, or psychotic thoughts (Tr. 287). Dr. Lambert diagnosed generalized anxiety disorder and insomnia and prescribed Ativan and amitriptyline (Tr. 287-288).
>
> At her follow-up the next month, Plaintiff reported she still had some anxiety and trouble sleeping (Tr. 289). She stated the Ativan helped with severe episodes of physical shaking and anxiety, but she had to take two to three each day (Tr. 289).

3

Plaintiff's examination was normal, including normal and appropriate mood and affect (Tr. 291). Her prescription was switched from amitriptyline to Paxil, and instructed to take the Ativan sparingly and try to wean down almost completely since it was addictive (Tr. 291). In September, Dr. Lambert refilled Plaintiff's Ativan prescription at her request, but he instructed her to schedule a follow-up visit (Tr. 296).

In October 2011, Dr. Lambert evaluated Plaintiff's high blood pressure (Tr. 297-299). She reported she did not do well on Paxil, and Dr. Lambert did not refill that prescription (Tr. 297, 299). Plaintiff reported her mood was better, but anxiety was still present (Tr. 297). Her examination was normal (Tr. 298). Dr. Lambert refilled Plaintiff's prescription for Ativan (Tr. 299).

The next month, Plaintiff returned for another blood pressure check (Tr. 301-302). She endorsed anxiety but denied depression (Tr. 301). She reported "doing better in some areas;" she was able to go shopping by herself and had her grandchild over for a night (Tr. 301). She stated her anxiety was "under better control," and she took Ativan only as needed (Tr. 301). She reported continued trouble sleeping and noisy neighbors upstairs (Tr. 301). At a follow-up later that month, she reported Ativan helped her sleep (Tr. 303). Her step-father had been diagnosed with a brain tumor, which had caused her more anxiety (Tr. 303). Upon examination, she had normal mood and appropriate affect (Tr. 304). Dr. Lambert noted that Plaintiff was "only on Ativan and doing better, will continue" (Tr. 305).

In January 2012, Plaintiff sent Dr. Lambert a letter requesting refills on all her medications, including Ativan (Tr. 306-307). She had stopped taking Ambien, which she felt made her depressed and weepy (Tr. 306). Dr. Lambert refilled Plaintiff's medications as requested (Tr. 307). When Plaintiff called for prescription refills in March 2012, she did not request a refill of Ativan (Tr. 308). Five months later, in May 2012, Plaintiff established care with Elizabeth Humston, D.O., who noted Plaintiff's last visit had been in November 2011 (Tr. 326). She reported feeling well with minor complaints (Tr. 326). Her appetite was normal, she exercised three days each week, and slept an average of seven hours each night (Tr. 326). Her anxiety and nervousness were "moderate in severity and improving" (Tr. 326). Her symptoms were exacerbated by stress, new situations, and job stress and were relieved by medications (Tr. 326). Her examination was unremarkable, with appropriate mood and affect (Tr. 327). Dr. Humston diagnosed anxiety and depression (Tr. 327). She gave Plaintiff a prescription for Prozac to try, and instructed her to try to wean off of the Ativan (Tr. 327).

The next month, in June 2012, Plaintiff returned to Dr. Humston for a physical (Tr. 321325). She was trying to wean herself off all medications for her anxiety and planned to try essential oils as well as possibly going to a counselor (Tr. 321). She stated she felt well with no complaints (Tr. 321). She was exercising weekly and sleeping seven hours a night (Tr. 321). Her examination was normal (Tr. 322). Dr. Humston did not address Plaintiff's anxiety in her assessment and plan, but gave

4

Plaintiff a printout on information for a counseling center and told her to follow-up in one month (Tr. 322).

In July 2012, Plaintiff told Dr. Humston she was "doing good" on Ativan (Tr. 319). Her mental status examination was normal (Tr. 320). She had not gotten established with a counselor because she could not afford it "at this time" (Tr. 320). She still wanted to wean off of Ativan (Tr. 320). Dr. Humston prescribed Celexa and discussed how to gradually wean off Ativan or use it only as needed (Tr. 320). At her monthly follow-up in August 2012, Plaintiff reported that she could not tolerate Celexa (Tr. 317). She was still tapering off of Ativan, and Dr. Humston discussed that she could be completely off it within the next month (Tr. 317). She instructed Plaintiff to schedule an office visit when she was out of the medication (Tr. 317).

In September 2012, Plaintiff reported to Dr. Humston that she had successfully decreased her use of Ativan to two tablets per day instead of three (Tr. 315). She reported "feeling much better" and stated her "creativity" had returned with taking less Ativan (Tr. 315). She wanted to continue tapering her medications (Tr. 315). Plaintiff described her mood and affect as "happy" (Tr. 316). Her mental status examination was entirely unremarkable (Tr. 316). Dr. Humston reduced the number of prescribed Ativan to reflect Plaintiff's decreased usage (Tr. 316). Plaintiff did not return until one year later in September 2013 (Tr. 340).

Plaintiff applied for disability benefits in May 2013 (Tr. 197). In July, the agency contacted Dr. Lambert on Plaintiff's behalf for a medical opinion on her anxiety and depression (Tr. 272-273). Dr. Lambert marked that as of her last visit in November 2011, Plaintiff's generalized anxiety disorder resulted in a "severe impairment" in her "social ability" (Tr. 273).

At the end of August 2013, Arthur Stair, III, M.A., a licensed senior psychological examiner, performed a consultative examination of Plaintiff at the request of the agency (Tr. 328333). Charlton Stanley, Ph.D., a supervising psychologist, co-signed the report (Tr. 333). In describing her symptoms, Plaintiff reported symptoms of mild anxiety, mild panic features, and mild depressive features (Tr. 330). She also mentioned "occasional mild suicidal ideation" but "clearly" reported no current suicidal intent (Tr. 330). Upon examination, Plaintiff was observed to have good hygiene and grooming and was dressed acceptably and appropriately for the weather (Tr. 328). She demonstrated an average ability to think abstractly and an average ability to answer logic-based questions (Tr. 329). She easily answered elementary mathematical equations and she performed fairly well on the serial 7s task (Tr. 329). Her thinking pattern was well-organized and she did not have difficulty maintaining a logical and coherent train of thought (Tr. 330). She demonstrated an average degree of higher executive functioning (Tr. 330). Her affect was dysphoric throughout the interview and she remained tearful throughout the evaluation; otherwise, no unusual or bizarre behaviors or mannerism were observed (Tr. 330). Her attention span was rated "fair to good" (Tr. 330). She was

responsive to questioning, established rapport, and had normal speech and good eye contact (Tr. 330).

Diagnostic impressions included anxiety disorder (not otherwise specified, mild, with panic features) and mild depressive features (Tr. 331). Stressors included a reported inability to work, difficulty adjusting to reported physical limitations, and financial concerns (Tr. 331). Her global assessment of functioning (GAF) score was assessed as 57 (Tr. 331).[1]  ([1] A GAF score is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. Rev. 2000) (*DSM-IVTR*).). A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM-IV-TR* at 34.) With regard to Plaintiff's ability to make personal, social, and vocational adjustments, Mr. Stair (co-signed by Dr. Stanley) opined that Plaintiff was "not impaired" in her ability to understand simple information or directions with the capacity to put it to full use in a vocational setting or her ability to comprehend and implement multistep complex instructions (Tr. 331). She was "mildly impaired" in her ability to maintain persistence and concentration on tasks for a full workday and workweek, her ability to changes in the workplace, and her social relationships (Tr. 331).

In September 2013, at the initial level of review, State agency psychological consultant Rebecca Joslin, Ed.D., found that Plaintiff's anxiety and depression were severe impairments (Tr. 47). Dr. Joslin considered Dr. Lambert's assessment that Plaintiff had marked restrictions in social functioning, but gave it little weight, as she "felt [it was] too restrictive for totality of evidence" (Tr. 49). She also noted the opinion was not accompanied by supporting evidence and was inconsistent with Plaintiff's reports of getting along with others and her ability to interact appropriately during her examinations (Tr. 49). She also considered Dr. Stanley's assessment of Plaintiff's mental impairments as non-severe, but "felt [it was] somewhat of [an] underestimate of [Plaintiff's] limits" (Tr. 49). She assessed that Plaintiff's mental impairments resulted in moderate restrictions in activities of daily living; mild difficulty maintaining social functioning; and mild difficulty maintaining concentration, persistence, or pace (Tr. 47). She had experienced no episodes of decompensation of extended duration (Tr. 47). Dr. Joslin opined that Plaintiff would be able to adapt to infrequent changes in the workplace (Tr. 49-50). Near the end of September 2013, one year after her last office visit, Plaintiff saw Dr. Humston for a recheck of hypertension (Tr. 340). With respect to her anxiety, she reported doing well on Ativan; she was still taking it twice each day due to "anxiety and family stressors" (Tr. 340). Her examination was unremarkable, with appropriate mood and affect (Tr. 341). Dr. Humston assessed that Plaintiff's anxiety and depression were "doing well, cont[inue] current meds" (Tr. 342).

In November 2013, at the reconsideration level of agency review, State agency psychological consultant Jeanaan Khaleeli, Psy.D., reached the same conclusions as Dr. Joslin (Tr. 63-64). She also concluded that Plaintiff's limitations would not

prevent her from being able to adapt to infrequent changes in the workplace (Tr. 63-64).

Plaintiff returned to Dr. Humston for a physical examination in November 2014, fourteen months after her last visit in September 2013 (Tr. 350-354). She reported feeling well with no complaints (Tr. 350). She ate a balanced diet, exercised three to four times per week and slept seven hours per night (Tr. 350). She did not report any anxiety or depression-related symptoms (Tr. 350). Her examination was normal (Tr. 351). Dr. Humston's assessment and plan did not include anxiety or depression (Tr. 351-352). Notably, she reduced Plaintiff's Ativan to only one tablet daily (Tr. 350).

[Doc. 19, pg. 3-9].

The following occurred at the administrative hearing:

At her administrative hearing in February 2015, Plaintiff testified that she could no longer work due to limitations from anxiety (Tr. 32). She described "shaking and just bursting into tears for no reason" (Tr. 32). Her body "would all go stiff" and her "heart would just pound all day long" (Tr. 32). She stated that she experienced those symptoms if she tried "to do too much" (Tr. 33). She stated that she lived "a quiet life" to control her symptoms (Tr. 33). She usually only went out once per day (Tr. 33). She did not go to church because of the possibility of people coming up to her (Tr. 34). She only socialized with friends online (Tr. 34). She stated that being around people and trying to interact was difficult (Tr. 35-36). On her bad days, maybe a couple days each week, she would cry, shake, stay in her robe most of the day, and not leave her house (Tr. 36).

Jane Colvin-Roberson, a vocational expert, also testified at Plaintiff's administrative hearing (Tr. 37-40). The ALJ presented the vocational expert with a hypothetical question that identified an individual of Plaintiff's age, education, and work experience, who had no exertional limitations and the nonexertional limitations as set forth by Mr. Stair and Dr. Stanley in Exhibit 3F (Tr. 39). The vocational expert testified that those limitations would have "very little impact" on the described individual's ability to perform skilled, semi-skilled, or unskilled work (Tr. 3940). The ALJ also presented a hypothetical question describing an individual with the same vocational profile, but with the limitations described by Plaintiff in her testimony (Tr. 40). The vocational expert testified that there would be no work that such a person could perform (Tr. 40). Plaintiff's attorney had no questions for the vocational expert (Tr. 40).

[*Id.* at 9].

7

## III. The ALJ's Findings

On February 13, 2015, the ALJ published his decision. First, he found that Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2015. Next, the ALJ found that she has not engaged in any substantial gainful activity since January 31, 2011, the alleged onset date. He then concluded at step two that there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. (Tr. 14). In arriving at this decision, the ALJ found that Plaintiff's allegations of disabling symptomatology were not credible and not supported by the objective evidence of record. (Tr. 17). He gave great weight to the findings of the State Agency physician that Plaintiff's essential hypertension and gastrointestinal disorders were both non-severe impairments as he considered that opinion to be supported by the objective medical evidence of record. (*Id.*). However, the ALJ found the State Agency psychologist's assessment that her affective and anxiety disorders were severe impairments to be inconsistent with the evidence of the record. (*Id.*). He then afforded greater weight to the consultative examiner's assessment of Plaintiff having mild limitations in her ability to perform work-related activities. (*Id.*). Based on his overall determination that no medically determinable impairments exist, the ALJ held that Plaintiff is not under a disability from the alleged disability onset date through the date of his decision. (*Id.*).

## IV. Analysis

Plaintiff asserts that the ALJ erred by concluding that she has no medically determinable impairments. She focuses her arguments solely on her alleged mental impairments, and in particular her anxiety. (Tr. 28). Plaintiff avers that not only does the objective medical record demonstrate that she has medically determinable mental impairments, the record also establishes

8

that these impairments are severe. She claims that the ALJ's determination is not supported by substantial evidence, and a remand is required.

In the ALJ's assessment of the medical opinions contained in the record, he failed to afford any weight or even mention Dr. Lambert's opinion that Plaintiff has a severe impairment in her social abilities or her overall treatment and diagnoses of Plaintiff. (Tr. 273). Notably, the Commissioner concedes that Dr. Lambert is properly classified as a "treating source" based on her treatment history with Plaintiff. [Doc. 19, pg. 17-18]. The Court agrees with the Commissioner's assessment of Dr. Lambert as a treating source. Acknowledging that the ALJ failed to address Dr. Lambert's opinion, the Commissioner argues that the Court should infer that the ALJ implicitly rejected her opinion of an existing impairment as he found Plaintiff to have no more than mild limitations in social functioning.

Controlling regulations and case law ascribe different analyses to determine the weight to afford a medical source depending on whether the source is a treating source. The "treating physician rule" as set out in 20 C.F.R. § 404.1527(c) is one of the bedrock principles of Social Security law, discussed in numerous Sixth Circuit cases. For example, "[i]t has long been the law that substantial deference—and, if the opinion is uncontradicted, complete deference—must be given to such opinions and diagnoses." *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (citing *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

The regulations define a treating source as "an acceptable medical source" who provides the claimant with treatment or evaluations and who has or had "an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 416.902, 404.1502. The regulations further state an ongoing treatment relationship is demonstrated when the "medical evidence establishes that you see, or

have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition." *Id.* at § 404.1502. The regulation itself further precludes finding that an ongoing treating relationship can be created by a claimant seeing the source "solely on your need to obtain a report in support of your claim for disability." *Id.*

Treating source opinions are entitled to great deference. In *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004), the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. The court noted that the regulation expressly contains a "good reasons" requirement. *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). In the recent case of *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), the Sixth Circuit went into great detail about how ALJ's must evaluate testimony of a treating physician, such as Dr. Lambert. In this regard, the Court stated:

> [T]he Commissioner has mandated that the ALJ ''will'' give a treating source's opinion controlling weight if it ''is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.'' 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: ''the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'' *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)).
>
> Importantly, the Commissioner imposes on its decision makers a clear duty to ''always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'' 20 C.F.R. § 404.1527(d)(2). Those good reasons must be ''supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'' Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the

> claimant's procedural rights. It is intended ''to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'' *Wilson,* 378 F.3d at 544.

*Id.* at 937.

The ALJ thus has an affirmative duty to specify good reasons to justify giving little or no weight to a treating source. The Commissioner's regulations give the claimant a "procedural right" to understand from reading the hearing decision why their doctor's opinion was not enough for them to be found to be disabled. In explaining a decision to discount a treating source opinion, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician, *see Hensely v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009), or that the objective medical evidence does not support that opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552-52 (6th Cir. 2010).

As noted *supra*, the ALJ wholly failed to consider and weigh Dr. Lambert's medical opinion. Although the Commissioner does an excellent job at pointing to evidence that would potentially support the ALJ affording less weight to Dr. Lambert's opinion, as highlighted by *Cole*, *supra*, at 397, "[t]he Commissioner imposes this duty [to state such reasons] on its decision makers," and not in a *post hoc* argument by the Commissioner. This is a procedural right of the plaintiff and a necessity for proper review by this Court for the adjudicator *himself* to state sufficiently specific reasons for the weight given to a treating source. *Blakely*, *supra*, at 407.

Based upon the foregoing analysis, the Court finds that the Commissioner's treatment of Dr. Lambert's opinion does not conform to applicable standards, and that the Commissioner's position is not substantially justified. Accordingly, the plaintiff's Motion for Judgment on the Pleadings [Doc. 14] is GRANTED, and the Commissioner's Motion for Summary Judgment [Doc.

18] is DENIED. The Court orders the case to be REMANDED back to the Commissioner for a more appropriate explanation in accordance with the cases cited above.

SO ORDERED:

s/Clifton L. Corker
United States Magistrate Judge